No. 30,452.

TERSILLO CANESTRO et al., *Appellees,* v. THE JOPLIN-PITTSBURG RAILROAD COMPANY, *Appellant.*

(10 P. 2d 902.)

Opinion filed May 7, 1932.

*C. O. Pingry, Carl Pingry,* both of Pittsburg, and *Mercer Arnold,* of Joplin, Mo., for the appellant.

*Thomas D. Winter,* of Girard, *E. W. Patterson* and *B. W. Weir,* both of Pittsburg, for the appellees.

The opinion of the court was delivered by

SLOAN, J.: This was an action to recover damages for the wrongful death of a person. The plaintiffs prevailed, and the defendant appeals.

The defendant operates a street-car system in the city of Pittsburg, which extends north of the city limits on the public highway for a distance of approximately one-half mile. The street-car track is in the middle of the public highway, and on either side of the track there is a brick pavement sixteen feet wide. The space between the pavement in which the track is located is nine feet wide. This is filled with chat extending over the ties and along the rails of the track. On Saturday night, December 14, 1929, at about 8:40, Claude Briggs, an employee of the defendant, was operating what is known as a one-man street car over the track above described when a collision occurred between the street car and an automobile driven by the deceased about a quarter of a mile north of the city limits of Pittsburg. The road and the track for a distance of several hundred feet on either side of the place where the collision occurred was straight and the slope was from the south to the north.

The night was dark and foggy, visibility was poor and the pavement and rails of the track were wet and slick. The street car had a light in front, and the inside of the car was lighted. The light was visible for 600 or 700 feet. The deceased, Dominic Canestro, a young man nineteen years of age and a son of the plaintiffs, was driving south in a Ford automobile on the west strip of the pavement. He was driving behind two other automobiles. When about 350 feet north of the street car he drove on to the street-car track to pass the automobiles. He was driving at about forty-five miles an hour with the left wheels of his car between the rails and the right wheels on the pavement. When the motorman saw the automobile coming he threw on the air brake to its full capacity, blew the whistle on the car and threw it into reverse. The automobile continued its course on the street-car track, resulting in the collision. The automobile was thrown to the west for a distance of about fifteen feet, where it struck a pole, and was badly damaged. The driver, Dominic Canestro, was killed.

There was evidence tending to show that the roadbed of the street-car track was covered with loose chat; that the chat was uneven and bumpy, containing holes, some of them five or six inches deep; that the rails and the pavement were, in some places, three inches or more higher than the chat filling between the rails, and that the imprint of an automobile tire was visible along the side of the rail for a distance of about thirty feet. On the other hand, there was evidence consisting of photographs and other testimony to the effect that the roadbed was in good condition. The eyewitnesses to the collision testified in substance that the deceased made no effort to get off the track; that there was no indication of the rail preventing the automobile from being driven back on to the pavement, and that the deceased did not reduce his speed before striking the street car. The jury returned a general verdict in favor of the plaintiffs and made special findings, as follows:

"Q. 1. How many feet was the automobile which was being operated by Dominic Canestro from the street car at the time that Canestro turned such automobile on the street-car track? A. 350 feet.

"Q. 2. How many feet did Dominic Canestro drive the automobile after turning it on the street-car track before the collision of the automobile and street car occurred? A. 200 feet.

"Q. 3. How many feet was the street car run after the motorman applied the emergency brake on the street car before the collision between the automobile and street car occurred? A. 50 feet.

"Q. 4. At what rate of speed per hour was Dominic Canestro operating the automobile 200 feet from the place of collision? A. 40 or 45 miles per hour.

"Q. 5. Did Dominic Canestro slacken the speed of the automobile after he drove the automobile on the street-car track and before the collision between the street car and the automobile? A. Don't know.

"Q. 6. At what rate of speed per hour was Dominic Canestro operating the automobile at the time of the collision between the automobile and the street car? A. Don't know.

"Q. 7. At what rate of speed per hour was the street car being operated at the time of the collision? A. 10 miles per hour.

"Q. 8. How many feet did the automobile in which Dominic Canestro was riding travel after the collision of such automobile with the street car and before such automobile was stopped by the pole? A. 15 feet.

"Q. 9. How many feet did the street car travel after the collision of the automobile with the street car? A. About 40 feet.

"Q. 10. If you find the defendant guilty of negligence causing the death of Dominic Canestro, state the act or acts of negligence of which you find the defendant guilty. A. Roadbed dangerous and unsafe."

Judgment was rendered in accordance with the general verdict, and the case is properly here for review.

The appellant assigns as error the court's ruling on the motion for a judgment notwithstanding the general verdict. It contends, first, that the evidence and the findings of the jury do not show that the alleged condition of the roadbed was the proximate cause of the injury, and, second, that the evidence and findings of the jury show that the deceased was guilty of negligence contributing to his injury and death.

It was alleged in the petition that the appellant negligently and carelessly permitted its track and roadbed to become and remain dangerous and unsafe, in that it allowed the chat to be so worn away that the rails protruded above the level of the highway, and such condition was the direct and proximate cause of the injury. It was also alleged that the motorman by the exercise of reasonable and proper diligence could have stopped the street car and avoided the collision. This allegation of negligence is eliminated and the motorman is exculpated by the finding of the jury that the negligence of the appellant was "roadbed dangerous and unsafe." The only evidence which in any way tends to connect the condition of the roadbed with the accident is the testimony of Steve Salina, who testified that he reached the scene of the accident shortly after it occurred and before the deceased had been taken from the automobile, and that he examined the rail south of the street car with a flash light.

"Q. And did you make any examination of the rail itself along at the point of the accident and prior to the point of the accident—the rail of the street-car company? A. Yes, sir. It was foggy that night and there was moisture on the ground and rails.

"Q. Just tell us what you saw on the rail itself, Mr. Salina—you have told us that your opinion was—tell what you saw. A. I saw tire tracks, where it had slid right up against the rail.

"Q. And for how long a period did this imprint continue, Mr. Salina? A. Some 30 feet."

The motorman testified as follows:

"When I was going down this hill, I saw a car turn out on to the roadbed. There were two automobiles between my car and this automobile when it pulled out on the track, I should judge around 300 or 350 feet away. The first car was about 250 feet from the street car when he pulled out. The second car was between the first car and the car that turned out. I should judge the second car was 40 or 50 feet from the first car, the car that turned out to pass these two cars. He had plenty of time to get back on the paved stretch of the highway. He never made an effort to get back. When you see a car coming right straight at you, astraddle of the rail, you could see whether it would deviate one way or another. I could have told if he was trying to turn out. I could see both front wheels on his car. The lights on his car were burning. When he passed the first car, I should judge he was 200 feet from me. The night was a moonlight night—it was dark because it was cloudy. I stood in my car and could see that the wheels of this car (Canestro's) weren't stuck or entangled with the rails."

The jury apparently accepted the testimony of the witness, Salina, and from this evidence concluded that the deceased was unable to turn his car off the track for the reason that the roadbed was lower than the rail. There is no testimony, however, that the tire on the automobile showed any indications of having rubbed against the rail, nor is there any testimony of any disturbance of the chat. In view of the position of the automobile passed by the deceased, the rate of speed the jury found he was traveling and the condition of the roadbed as shown from the photographs, the evidence is not at all convincing that the condition of the roadbed was the proximate cause of the injury. The finding of the jury is, of course, binding on this court when approved by the trial court, if there is any substantial evidence to support it. The burden, however, was on the appellees not only to show that the appellant was negligent in some particular, but it must also appear that the negligence in some way contributed to and was the proximate cause of the injury. The rule is well established by this court that negligence may be proven by circumstantial evidence, but the circumstances must be of such a

nature and so related to each other that it is the only conclusion that can reasonably be drawn from them. A fact is not proven by circumstances which are merely consistent with its existence. (*Byland v. Powder Co.,* 93 Kan. 288, 144 Pac. 251; *Cash v. Oil Refining Co.,* 103 Kan. 880, 176 Pac. 980; *Lukens v. Kellogg,* 127 Kan. 568, 274 Pac. 225.)

We pass the question of appellant's negligence with the remark that it is exceedingly doubtful whether a case of actionable negligence was made out, and take up the second assignment of error that the deceased's negligence contributed to his death, which, we hold, is decisive of the case.

The jury appear to have accepted the testimony of the motorman with reference to the location of the cars and the rate of speed at which they were traveling. When the deceased turned his automobile on the street-car track he was 350 feet from the street car. He was traveling between 40 and 45 miles an hour. The street car was clearly within the range of his vision and he must be charged with having seen it. The second car which he was attempting to pass was about 100 feet south of him, or 250 feet north of the street car. The street car was traveling down grade. The motorman immediately applied his brakes and when the collision occurred he was traveling ten miles an hour. The jury was unable to find whether the deceased slackened the speed of his automobile before the collision. The fair inference is, from all the surrounding circumstances, that the deceased did not slacken his speed.

It is the duty of the traveler, as far as he reasonably can, to keep off the street-car tracks, but he is not obliged to do so. The rights of the automobile traveler and the street-car company in the use of a highway, such as described in this case, are equal, but with this limitation, the street car cannot quit its tracks and turn out in order to pass the traffic, the traveler must turn out for it. (*Railway Co. v. Rouch,* 66 Kan. 195, 71 Pac. 257.) This court has made a distinction between the duty and responsibility of a traveler approaching a railroad track and a street-car track. It said:

". . . In the case of the railroad the traveler is never regarded as exercising reasonable caution if he loses in a race with the train to the crossing. He is required to yield it the right of way and not undertake to cross until it has passed. But one who sees a street car approaching may properly cross the track if under all the circumstances it is reasonable to suppose there is time for him to do so in safety. . . ." (*Ogden v. Wilson,* 120 Kan. 269, 271, 243 Pac. 284.)

. The street-car track was a warning of danger (*Galloway v. Interurban Railway Co.*, 97 Kan. 110, 154 Pac. 236), and the deceased must be charged with knowledge that the track was wet and slick; that the street car was coming down grade; that the space between the rails was not paved, but filled with chat; that the street car would not deviate from its course, and that if he was on the track the only thing that could avert a collision was the stopping of the street car. He was traveling on a sixteen-foot pavement, and voluntarily left a place of safety and assumed a position of danger to pass a car which was then 100 feet ahead of him. The rate of speed at which this car was traveling is not established, but in any event he would be compelled to travel considerably more than 100 feet before he could pass the car and return to a place of safety.

Appellees cite the case of *May v. Kansas Power & Light Co.*, 134 Kan. 470, 7 P. 2d 108, recently decided by this court, but that case has no application to the case under consideration. There the accident did not happen because the plaintiff drove upon the street-car track in front of an approaching car; it happened because the automobile was caught in a rut beside the rail of the track and the motorman was negligent in failing to stop the street car, which he had an opportunity to do, and avoid the collision. In this case the motorman is exonerated. He was not negligent.

. Appellees cite the case of *Collins v. State Highway Comm.*, 134 Kan. 278, 5 P. 2d 1106, in which it was said that a pitfall in a shoulder adjoining or even adjacent to the slab may constitute a defect in the highway. In that case, however, the driver of the car left the pavement to avoid a danger. He did not voluntarily enter upon a place of apparent danger.

The court is convinced, under all of the circumstances of this case, that the deceased's negligence contributed to his injury, in that he failed to use the care of an ordinary, prudent person in the use of the public highway and voluntarily entered upon a place of danger with full knowledge of all the attending dangers incident thereto. Had he waited but a few seconds he could have accomplished his purpose in safety. This was not only his duty, but common prudence. It has been repeatedly held by this court that persons may not recklessly place themselves in a place of danger and then recover damages because of injuries resulting thereby. (*Limb v. Railroad Co.*, 73 Kan. 220, 84 Pac. 136, and cases there cited; *Fair*

*v. Traction Co.,* 102 Kan. 611, 171 Pac. 649; *Gaffney v. Railway Co.,* 107 Kan. 486, 192 Pac. 736.)

The judgment of the district court is reversed and it is directed to enter judgment for the defendant.